**In re CHATEAUGAY CORPORATION, Reomar, Inc., LTV Corporation, LTV Steel Company, Inc., LTV Steel Tubular Products Company, Debtors.**

**FRITO–LAY, INC., FL Holding, Inc., Ainwick Corporation, and Aetna Casualty and Surety Company, Plaintiffs–Appellants,**

**v.**

**LTV STEEL CO., INC., Chateaugay Corporation, Reomar, Inc., LTV Corporation, Kentron Saudi Arabia, Inc., LSC Leasing, Inc., The LTV Corporation (Wyoming), LTV International, N.V., LTV Sales Finance Company, LTVUS Corp., Repsteel Overseas Finance N.V., LTV Educational Systems, Inc., BCNR Mining Corporation, Bardale Coal Company, Barrel Corporation of West Virginia, Crystalane, Inc., Crystalee Coal Co., Dearborn Leasing Co., Erie B. Corporation, Erie Development Co., Erie I Corporation, LTV Steel Mining Co., (for-**

merly Erie Mining Company), Georgia Tubing Corporation, Gulf States Steel Corporation, J.W. Storage Company of Ohio, Jalcite I, Inc., Jalcite II, Inc., Jarole Mining Company, Ltd., Jones & Laughlin Environmental Properties, Inc., Jones & Laughlin Mining Company, Ltd., Jones & Laughlin Ore Mining Company, LTV Electro–Galvanizing, Inc., LTV Holdings, Inc., LTV Leasing, Inc., LTV Steel Tubular Products Company, Lorain Pellet Terminal Co., Lykes Equipment Corporation, Lykes Leasing Corporation, Nemacolin Mines Corporation, Republic Buildings Corporation, Republic Drainage Products Company, Republic Technology Corporation, Republic–Reserve, Inc., Tuscaloosa Energy Corporation, YST Erie Corporation, Youngstown Erie Corporation, LTV Aerospace and Defense Company, National Telephone Systems, Inc., Sierra Information Systems Corporation, Sierra Research International Corporation, Universal Time/Frequency, Inc., LTV Industries, Inc., LTV Multinational, Inc., Vought Overseas, Ltd., LTV Vehicle Corp., Amland Corporation, Vought Properties, Inc., LTV Energy Products Company, Continental EMSCO Company, FC Divestiture Corporation, Halcorp, Inc., J.K. Industries, Inc., Juddcorp, Inc., LTV Properties, Inc., Oil States Offshore Marine, Inc., Oil States Rubber Co., Technical Plastics, Inc., et al., Debtors–Appellees,

The Official Committee of Unsecured Creditors of the LTV Corporation 'LTV' and The Official Committee of Unsecured Creditors of the LTV Steel Company, Inc., Appellees.

Nos. 2058, 2059, 2061 to 2064, Docket 93–5048L, 93–5050CON, 93–5056CON, 93–5058CON, 93–5060CON and 93–5062CON.

United States Court of Appeals, Second Circuit.

Argued July 15, 1993.

Decided Nov. 29, 1993.

Michael J. Crames, Guy Miller Struve, New York City (Edmund M. Emrich, Arlene R. Alves, Lisa Martinez Wolmart, John C. Amabile, Robin L. Golomb, Kaye, Scholer, Fierman, Hays & Handler, Karen E. Wagner, Bradley J. Butwin, Linda A. Ginsberg, Davis, Polk & Wardwell, M. William Munno, Seward & Kissel, of counsel), for debtors-appellees and appellees.

Arthur S. Friedman, New York City (Friedman, Wang & Bleiberg, Martin I. Shelton, Shea & Gould, on the brief, Laurie R. Josephs, Charles R. Macedo, Christine P. Chudnovsky, of counsel), for plaintiffs-appellants Frito–Lay, Inc., FL Holding Inc. and Ainwick Corp.

Larry L. Simms, Washington, DC (Harold S. Horwich, Lorraine M. Weil, G. Eric Brun-

stad, Jr., Hebb & Gitlin, Hartford, Ct., on the brief, James P. Ricciardi, Gregory E. Barton, Gibson, Dunn & Crutcher, of counsel), for plaintiff-appellant, Aetna Cas. and Sur. Co.

Before MAHONEY, McLAUGHLIN and JACOBS, Circuit Judges.

JACOBS, Circuit Judge:

On May 27, 1993, the United States Bankruptcy Court for the Southern District of New York, Burton R. Lifland, *Chief Judge*, entered an Order confirming the Second Modified Joint Plan of Reorganization (the "Plan") in the bankruptcy proceedings of appellee LTV Corporation and its affiliated debtors (individually and collectively, "LTV" or the "Debtors"). The Plan was substantially consummated on June 28, 1993 or immediately thereafter. In this consolidated appeal, Frito–Lay, Inc., FL Holding, Inc. and Ainwick Corporation (collectively "Frito–Lay") primarily contest the confirmation of a plan that does not afford their claims administrative priority; and both Frito–Lay and Aetna Casualty & Surety Company ("Aetna") contest LTV's failure to establish a full reserve for their disputed priority claims, pending appeal of the Plan's confirmation, so that Frito–Lay's and Aetna's rights would not be prejudiced or mooted by the substantial consummation of the Plan.

(A) Frito–Lay and LTV were parties to a series of prepetition contracts known as "safe-harbor" leases—a kind of tax transaction encouraged by the federal tax laws for a brief period in the early 1980s. In the transactions giving rise to Frito–Lay's appeal, Frito–Lay nominally purchased tens of millions of dollars in depreciable assets used by LTV in its business, and at the same time nominally leased the assets back to LTV, paying the purchase price of the assets in accounting-entry installments that netted out as a wash against what LTV undertook to pay on the leasebacks. Frito–Lay also paid LTV substantial sums at the outset—the only part of the transaction in which value actually changed hands. In this way, Frito–Lay purchased tax benefits that LTV, as an unprofitable company, could not use.

After filing for bankruptcy protection, debtor-in-possession LTV retired many of the assets subject to the Frito–Lay leases. Under governing tax law, those retirements reduced the federal tax liability of the bankrupt estate and triggered adverse federal tax consequences for Frito–Lay. It is expected that the same consequences will ensue from likely future dispositions of some or all of the remaining assets. LTV has an undisputed obligation to indemnify Frito–Lay for the adverse tax consequences triggered by the disposition of assets subject to the leases. At each stage of these proceedings, however, Frito–Lay has contended that its indemnity claims for asset dispositions by the debtors-in-possession should be afforded administrative priority under the Plan, and that Frito–Lay's rights to indemnification for prospective, post-bankruptcy asset dispositions similarly should not be impaired.

Frito–Lay appeals from two orders of the United States District Court for the Southern District of New York. The first order, dated June 9, 1993, John E. Sprizzo, *Judge*, affirmed three orders of the United States Bankruptcy Court for the Southern District of New York, Burton R. Lifland, *Chief Judge*, entered July 31, 1989, February 18, 1992 and July 2, 1992, which, *inter alia*, authorized Frito–Lay's claims against LTV as pre-petition, general unsecured claims in the aggregate amount of $39,625,284. The second order, dated June 21, 1993, Michael B. Mukasey, *Judge*, affirmed two orders of the United States Bankruptcy Court for the Southern District of New York, Burton R. Lifland, *Chief Judge*, entered May 27, 1993 and June 7, 1993. To the extent relevant to this appeal, those orders: ruled that indemnification claims arising under Frito–Lay's unsecured safe-harbor leases must be treated as impaired; treated as unimpaired similar indemnification claims that were secured by guaranties under certain safe-harbor leases to which Frito–Lay was *not* a party; denied Frito–Lay's motion to compel LTV to reserve fully for Frito–Lay's asserted administrative priority claims pending appeal; and determined that the Debtors' reorganization plan could be confirmed while treating as unimpaired Inland Steel Company's contin-

gent claim against the Debtors for post-petition patent infringement.

(B) Aetna Casualty & Surety Company ("Aetna") issued approximately 262 surety bonds in pre-petition transactions to secure LTV's payment of workers' compensation claims to certain LTV employees, and later paid tens of millions of dollars under the bonds after LTV entered bankruptcy and defaulted on the underlying compensation claims. Aetna has been awarded fractional recovery as an unsecured creditor, having unsuccessfully argued before the bankruptcy court that the Plan impermissibly discriminates between (a) the workers' compensation claims that Aetna submitted as subrogee under the surety bonds and (b) the workers' compensation claims—paid as unimpaired under the Plan—that were submitted by LTV employees whose compensation claims were not bonded.

Aetna seeks review of an interlocutory order of the United States District Court for the Southern District of New York, Michael B. Mukasey, *Judge,* dated June 11, 1993, affirming an order of the United States Bankruptcy Court for the Southern District of New York, Francis G. Conrad, *Judge,* entered May 25, 1993, which, *inter alia,* denied Aetna's motion to compel the Debtors to reserve fully for Aetna's asserted administrative priority claims pending their appeal.

On June 14, 1993, Frito–Lay and Aetna moved this Court to stay confirmation of the Debtors' plan of reorganization and to grant expedited review of these appeals. On June 16, 1993, this court granted an interim stay, which preserved the status quo until a regularly scheduled motions panel of this Court could conduct a hearing. After hearing argument on June 22, 1993, the motions panel refused to issue a further stay but granted Frito–Lay's and Aetna's motions to expedite the appeals that we now decide.

## BACKGROUND

On July 16, 1986, the Debtors filed the first of their petitions for reorganization under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101, *et seq.* The bankruptcy court confirmed the Debtors' Plan by order entered May 27, 1993. The Plan went into effect on June 28, 1993, and was then or soon thereafter "substantially consummated" as that term is defined in Section 1101(2) of the Bankruptcy Code. 11 U.S.C. § 1101(2) (1988). Section 1101(2) defines "substantial consummation" as: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."

## JURISDICTION/MOOTNESS

The Debtors argue that the claims of Frito–Lay and Aetna are moot on appeal because (1) the bankruptcy court's May 27, 1993 order confirming the Plan (as affirmed by the district court), directs that "all property, assets and effects of the Debtors' estates not being held for distribution pursuant to the terms of the Plan shall [as of the effective date] re-vest in the respective Debtor companies subject to the provisions of the Plan, the Settlement Agreements and this Order.... free and clear of all claims and interests"; (2) the prospects for rehabilitation and a fresh start would be jeopardized if the reorganized entities were "saddled with lingering appeals" after the Plan's substantial consummation; and (3) granting the relief requested would adversely affect third parties not presently before this Court, including investors that "provided some $600 million of capital to the reorganized entities in reliance on the [Debtors'] financial condition."

 "[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed" by virtue of Article III's "case or controversy" requirement. *Church of Scientology v. United States,* ——— U.S. ———, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)). Within the bankruptcy context, "[a]n appeal should also be dismissed as moot when, even

though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir.1993) (citations omitted).

Frito–Lay and Aetna raise several distinct issues on appeal, and request various forms of relief. We will consider mootness in respect of the various issues as we reach them in our analysis.

## FRITO–LAY ISSUES

On appeal, Frito–Lay contests the district court's affirmance of the bankruptcy court decisions that (a) deny Frito–Lay's request for administrative priority on its safe-harbor lease indemnification claims; (b) permit the Plan to classify Frito–Lay's unsecured indemnification claims separately from the indemnification claims of parties that had secured their claims by letters of credit or otherwise; (c) do not estimate the other parties' contingent secured indemnification claims; (d) dismiss Frito–Lay's quasi contract and tort claims, which challenge LTV's right to retire certain of the qualified assets, or to treat them as retired; (e) permit LTV's plan of reorganization to classify as unimpaired Inland Steel Company's contingent claim against LTV (charging post-petition patent infringement), allegedly without sufficient consideration of the impact that claim might have on plan feasibility; and (f) deny Frito–Lay's request that LTV establish a full reserve for Frito–Lay's indemnification claims pending final appellate resolution of Frito–Lay's asserted right to administrative priority.[1]

### A. The Indemnity Claims

Frito–Lay contends on appeal that the bankruptcy court and the district court erred in classifying Frito–Lay's contractual indemnity claims as pre-petition and general unsecured. Frito–Lay's indemnity claims are based on twenty-five agreements between Frito–Lay and two corporate predecessors of LTV Steel Company (Republic Steel Company and Jones & Laughlin Steel, Inc.) which agreements were entered into in 1981 and 1982 pursuant to the now repealed "safe-harbor leasing" rules of the 1981 Internal Revenue Code.

1. *Safe-Harbor Leasing.* Section 168(f)(8) of the Economic Recovery Tax Act of 1981 ("Former Section 168(f)(8)") permitted certain corporations to enter into "safe-harbor leases", also known as "tax benefit transfer agreements". *See* Pub.L. 97–34, 95 Stat. 172 (1981); Temp. Income Tax Regs. ("Former Temp. Regs.") § 5c.168(f)(8), 46 Fed.Reg. 51908 (Oct. 23, 1981). Safe-harbor leases entered into pursuant to Former Section 168(f)(8) are tax-driven sale-leaseback arrangements designed so that certain unprofitable companies could raise revenue by separately marketing the tax benefits associated with certain types of business property without disposing of the property itself. A tax-benefit transfer agreement satisfying the requirements of Former Section 168(f)(8) affords a "safe-harbor" in the sense that it is treated as a sale-leaseback for federal tax purposes even where the parties do "not comply with State law requirements concerning transfer of title, recording, etc." Former Temp.Regs. § 5c.168(f)(8)–1(c).

In a typical safe-harbor lease under Former Section 168(f)(8), the owner of qualified property transferred the property's tax attributes by nominally selling the property for (1) a single cash payment, based upon the present value of the federal tax benefits asso-

---

1. By order dated June 24, 1993, this Court denied Frito–Lay's request that our review of the present appeal be based on (a) the briefs filed below, together with (b) supplemental appellate briefs of no more than 10 pages. As a result, the parties briefed this appeal in the usual manner pursuant to Federal Rule of Appellate Procedure 28. Frito–Lay nevertheless advises us, in its 41 page "Supplemental Brief", that "Frito–Lay and LTV agreed to submit this appeal on the record and briefs filed in the District Court, and to submit supplemental memoranda highlighting the matters addressed therein, and addressing any subsequent matters." This Court never authorized the parties to deviate from the requirements found in the Federal Rules of Appellate Procedure, and we therefore limit our review to those issues properly raised in the briefs filed on appeal. *See United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 130, 126 L.Ed.2d 94 (1993); *Gaste v. Kaiserman*, 863 F.2d 1061, 1069 n. 6 (2d Cir.1988).

ciated with the property, and (2) an installment payment obligation, approximating the property's value net of those tax benefits. At the same time, however, the purchaser leased back that property to the seller in exchange for rental payments that offset the installment note payments dollar for dollar. The purchaser's payments under the note and the seller's rental payments were thus a series of wash transactions. The only cash that actually changed hands was the initial cash payment. At the end of the lease term—still, for federal tax purposes only—the seller/lessee "repurchased" the property for a peppercorn. *See generally Armstrong World Industries, Inc. v. Commissioner,* 974 F.2d 422, 424, 431–32 (3d Cir.1992); *Tax Lease Underwriters, Inc. v. Blackwall Green, Ltd.,* 642 F.Supp. 1492, 1494 (E.D.Mo.1986); Joint Committee on Taxation Staff Pamphlet Analyzing Safe Harbor Leasing, 114 Daily Tax Rep. (BNA) J–29, 32 (June 14, 1982).

Pursuant to the Temporary Income Tax Regulations promulgated under the authority of Former Section 168(f)(8)(G), an asset loses its character as leased property under a tax benefit transfer agreement upon the happening of certain enumerated events. One of these "disqualifying events" is the retirement of the leased property. Former Temp. Regs. § 5c.168(f)(8)–8(b). When a disqualifying event happens, as when LTV retired assets during the bankruptcy proceedings, the seller/lessee—having retained ownership of the leased property for all purposes other than Former Section 168(f)(8)—is deemed to have repurchased the property for federal tax purposes. Former Temp. Regs. § 5c.168(f)(8)–8(d). The overall financial consequences of such a repurchase tend to be beneficial to the seller/lessee and detrimental to the buyer/lessor. For that reason, the buyer/lessor typically secured a contractual indemnification from the seller/lessee for any tax loss resulting from a disqualifying event, as Frito–Lay did here.

2. *The Frito–Lay/LTV Agreements.* Under the Frito–Lay/LTV safe-harbor leases, Frito–Lay purchased certain qualified property from LTV for (a) a cash payment of $189,460,229 (which, according to the parties, was based on the present value of the tax

benefits to be transferred), and (b) a nonrecourse, interest-bearing note in an amount based on the property's remaining value. Frito–Lay then "leased" the property back to LTV for a period of twenty-two and a half years in exchange for monthly rental payments equal to the monthly installment payments due under the note. Frito–Lay was to enjoy the federal tax benefits of the qualified property until expiration of the lease term, at which time Frito–Lay would reconvey the assets to LTV for a token payment. The three leases submitted by the parties as representative contracts for purposes of this litigation confirm that, although Frito–Lay owned the qualified property for federal tax purposes during the lease term, LTV at all times retained the other attributes of ownership—including the power to bring about a disqualifying event by selling or retiring the assets. For example, the October 12, 1982 lease between Republic Steel Corporation (as seller/lessee) and Frito–Lay, Inc. (as buyer/lessor) contains the following provision (in which the qualified assets are designated "Items of Equipment"):

[T]his Agreement shall not (a) effect a transfer of legal or equitable title to any Item of Equipment from Lessee to Lessor, (b) grant to Lessor any possessory right whatsoever in any Item of Equipment, or (c) grant to Lessor the right to claim any possessory right with respect to any Item of Equipment upon the occurrence or nonoccurrence of any event or under any circumstances whatsoever, including, without limitation, upon the occurrence of any breach by Lessee of any of its obligations hereunder. *Subject only to Lessor's right to claim Federal income tax deductions and credits with respect to each Item of Equipment as contemplated by this Agreement, Lessee shall retain all of the rights, benefits, incidents, burdens and obligations of ownership of each Item of Equipment, including, without limitation, the right to sell, transfer, assign or otherwise dispose of any Item of Equipment* and the obligation to pay all state and local taxes, all insurance premiums and all maintenance charges with respect to each Item of Equipment.... The use and possession of each Item of Equipment by Les-

see, and Lessee's rights therein, are not in any way conditioned on the payment of Basic Rental Payments or any other payments identified in this Agreement.

Section 7.01 (emphasis added). The same lease provides, however, that LTV will indemnify Frito–Lay for any resulting tax loss if LTV's ownership decisions interfere with Frito–Lay's right to claim federal income tax deductions and credits with respect to the qualified assets.

The qualified assets affected by the twenty-five safe-harbor leases were located at eighteen separate LTV production facilities. In 1987, after filing for bankruptcy protection, LTV permanently retired two of those facilities, one in Buffalo, New York, and one in Aliquippa, Pennsylvania. Those retirements caused the disqualification of a group of assets subject to the safe-harbor leases, and resulted in the return of tax benefits to LTV. According to Frito–Lay, the disqualifications compelled it to pay an additional $14 million in respect of its 1987 tax year alone.

3. *Frito–Lay's Request for Priority.* LTV has never disputed the validity of the safe-harbor leases or that LTV's indemnification duties were triggered when Frito–Lay suffered negative tax consequences resulting from the retirements of qualified property at the Buffalo and Aliquippa facilities. What is disputed is Frito–Lay's demand that its indemnification claims be afforded administrative priority status. In an opinion dated June 29, 1989, the bankruptcy court resolved the issue by granting summary judgment to the Debtors, on the ground that the safe-harbor leases do not constitute executory contracts or unexpired leases under Section 365 of the Bankruptcy Code and therefore that the indemnity claims are pre-petition, general unsecured claims which, as such, are not entitled to priority treatment under Sections 503 and 507 of the Bankruptcy Code. *In re Chateaugay Corp.*, 102 B.R. 335 (Bankr.S.D.N.Y.1989). An order consistent with the June 29, 1989 opinion was entered on July 31, 1989.

The district court affirmed the bankruptcy court's grant of partial summary judgment on the ground that, whether or not the safe-harbor leases could be considered executory contracts or unexpired leases, Frito–Lay's indemnity claims could not be afforded priority status because no post-petition act of Frito–Lay conferred a post-petition benefit on the Debtors. *In re Chateaugay Corp.*, 156 B.R. 391, 399 (S.D.N.Y. June 9, 1993); *In re Chateaugay Corp.*, No. 89 Civ. 6687 (S.D.N.Y. Mar. 29, 1990).

The district court's June 9, 1993 order also affirmed the bankruptcy court's July 2, 1992 order, which (a) established the allowed amount of Frito–Lay's *fixed* indemnity claims, which are based on undisputed disqualifications that occurred during the bankruptcy proceedings, and (b) estimated at 80 percent Frito–Lay's *contingent* indemnity claims, which are based on possible future disqualifications and disputed past disqualifications.

4. *Mootness.* LTV's overarching position on appeal is that relief can no longer be granted to Frito–Lay because the Plan has been substantially consummated, and that the appeal should therefore be dismissed as moot. Substantial consummation of a reorganization plan is a momentous event, but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief. *See, e.g., In re AOV Industries, Inc.*, 792 F.2d 1140, 1148 (D.C.Cir.1986) (substantial consummation is "not a blanket discharge" of "judicial duty to examine carefully each request for relief").

In bankruptcy proceedings, the mootness doctrine involves equitable considerations as well as the constitutional requirement that there be a case or controversy. These concerns often cannot be addressed separately; they "are interactive, as 'the finality rule limits the remedies a court can offer.'" *In re Public Service Co.*, 963 F.2d 469, 472 (1st Cir.) (quoting *In re Stadium Management*, 895 F.2d 845, 847–48 (1st Cir. 1990)), *cert. denied,* —— U.S. ——, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992). Constitutional and equitable considerations dictate that substantial consummation will not moot an appeal if all of the following circumstances exist: (a) the court can still order some effective relief, *Church of Scientology v. United States,* —— U.S. ——, 113 S.Ct. 447, 449, 121

L.Ed.2d 313 (1992); (b) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity", *In re AOV Industries, Inc.*, 792 F.2d at 1149; (c) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court", *In re Roberts Farms, Inc.*, 652 F.2d 793, 797 (9th Cir.1981); (d) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings", *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 841 F.2d 92, 96 (4th Cir.1988) (citations omitted); and (e) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from", *In re Roberts Farms, Inc.*, 652 F.2d at 798.

■ The value of Frito–Lay's potential recovery on its priority claims is in dispute. If successful on the merits, Frito–Lay asserts that it will be entitled immediately to approximately $20 million (the amount of Frito–Lay's claimed tax loss to date); LTV places Frito–Lay's maximum recovery on a priority basis at $875,000 (the amount of tax benefits LTV allegedly derived from retiring its assets). Under either calculation, Frito–Lay argues that relief can be granted so as not to unravel the reorganization plan or adversely affect parties not before this Court. Specifically, Frito–Lay seeks the recoupment of funds that (pursuant to the Plan) re-vested in LTV or were distributed to parties represented on this appeal. In response, LTV states (1) that such payment is inconsistent with the bankruptcy court's May 27, 1993 order (as affirmed by the district court's June 21, 1993 order) which directs that, upon the effective date, all assets not being held for distribution pursuant to the terms of the Plan are to re-vest in the debtor companies "free and clear of all claims and interests", and (2) that such payment would "severely deplete" its $200 million in working capital upon which "other creditors have relied in approving and consummating the Plan." No

argument against recoupment of funds is advanced specifically on behalf of appellee The Official Committee of Unsecured Creditors of the LTV Corporation or on behalf of appellee The Official Committee of Unsecured Creditors of the LTV Steel Company, Inc.

Despite the present uncertainty as to how much money is at stake, and what parties might be liable for its payment, the appellees do not dispute that the only way Frito–Lay could win on the merits is upon a finding that Frito–Lay was entitled to funds that, at least to some extent, were wrongfully distributed to or wrongfully re-vested in one or more entities that are now before this Court. That being so, we would be able to fashion effective relief to the extent of remanding with instructions to the bankruptcy court to order the return to Frito–Lay of any funds that were erroneously disbursed to such parties, to the extent that can be done manageably and without imperiling LTV's fresh start. *See, e.g., In re Spirtos*, 992 F.2d 1004, 1007 (9th Cir.1993); *In re International Environmental Dynamics, Inc.*, 718 F.2d 322, 326 (9th Cir.1983). We are not persuaded by LTV's argument that Frito–Lay's appeal is mooted as a result of the bankruptcy court's order that the assets re-vested in LTV are to be held "free and clear of all claims and interests." The district court's affirmance of that order is before us on this appeal.

The bankruptcy court made no determination (as it might have during its consideration of Frito–Lay's stay application) as to how payment of Frito–Lay's claims might affect LTV's re-emergence as a revitalized entity. Although counsel for LTV has assured a prior panel of this Court that his client would endeavor to pay any judgment to Frito–Lay without relapsing into Chapter 11, this Court is in no position to evaluate or act upon that assurance, nor can LTV's counsel speak for the numerous interests that were represented at the confirmation hearings and that would still suffer if the reorganization failed. Similarly, although reorganized LTV presents itself on appeal as an invigorated multi-billion dollar operation with $200 million in working capital and a $400 million line of credit, we are in no position to determine the effect that granting all of the requested relief

would have on parties, such as investors, not before this Court.

■ Nevertheless, a remand is not necessary. Although the bankruptcy court might determine that full relief is no longer available to Frito–Lay after substantial consummation, we are convinced that at least some effective relief could be granted. Certainly, Frito–Lay would readily accept some fractional recovery that does not impair feasibility or affect parties not before this Court, rather than suffer the mootness of its appeal as a whole. *Cf. MCI Telecommunications Corp. v. Credit Builders of America, Inc.*, 2 F.3d 103, 104 (5th Cir.) ("[A] case is not mooted by the fact that an impecunious judgment debtor may lack the means to satisfy a judgment." (citations omitted.)), *cert. denied*, —— U.S. ——, 114 S.Ct. 472, 126 L.Ed.2d 424 (1993). A claimant should not be out of court on grounds of mootness solely because its injury is too great for the debtor to satisfy in full.

Also significant is that Frito–Lay sought to stay confirmation of the Plan in urgent applications before the bankruptcy court, the district court and this Court. Frito–Lay did not prevail on any of those applications, but that result certainly cannot be attributed to any lack of initiative. Although we recognize the value of finality in bankruptcy proceedings and the need to afford reorganized LTV a "fresh start", those considerations are not sufficient to moot this issue on appeal.

5. *Debtors' Right to Reject Contracts and Leases.* Subject to court approval, a bankruptcy trustee or debtor-in-possession may assume or reject an executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a) (1988). Claims arising under contracts or leases so assumed are afforded administrative priority. Paragraph 8.1 of the Plan addresses LTV's assumption and rejection of contracts under Bankruptcy Code Section 365:

> The Debtors assume on and as of the Effective Date pursuant to Section 365 of the Code any and all executory contracts and leases of real estate except those which shall prior to the Confirmation Date have been rejected pursuant to Section 365 of the Code. For such purpose, *unsecured*

> *Tax Benefit Transfer Agreements shall constitute non-executory contracts.*

(Emphasis added.) Bearing these factors in mind, Frito–Lay seeks priority by arguing (1) that the Plan assumes all executory contracts that are not expressly rejected, (2) that Frito–Lay's safe-harbor leases are executory contracts, notwithstanding the Plan's categorization of unsecured tax benefit transfer agreements as non-executory, (3) that it is undisputed that LTV never expressly rejected the Frito–Lay leases, and therefore (4) that the Frito–Lay leases must be considered assumed. Frito–Lay also maintains that the safe-harbor leases are "unexpired leases" under Section 365, but offers no rationale for considering such "unexpired leases" assumed.

In briefing before this Court, the parties hotly contest whether or not the Frito–Lay safe-harbor leases properly can be categorized as executory contracts or unexpired leases; the bankruptcy court found that they are neither. *In re Chateaugay Corp.*, 136 B.R. 79, 83–84 (Bankr.S.D.N.Y.1992); *In re Chateaugay Corp.*, 102 B.R. 335, 350–56 (Bankr.S.D.N.Y.1989). The district court found it unnecessary to resolve the issue, holding that, even if the safe-harbor leases could be considered executory contracts or unexpired leases, the Debtors at no time elected to assume them and, in fact, were not entitled to assume them because Frito–Lay performed no post-petition act that benefited the Debtors. *In re Chateaugay Corp.*, 156 B.R. 391, 399 (S.D.N.Y.1993). *Cf. In re Grayson–Robinson Stores, Inc.*, 321 F.2d 500, 502 (2d Cir.1963) ("[I]n making a determination whether or not to reject, the advantages of giving and receiving further performance are to be weighed against the disadvantages."). Hence, both the district court and the bankruptcy court held that Section 365 and Paragraph 8.1 do not confer priority on Frito–Lay's claims. We affirm on grounds similar to those stated by the district court.

■ The main purpose of Section 365 is to allow a debtor to reject executory contracts in order to relieve the estate of burdensome obligations while at the same time

providing "a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1310 (5th Cir.1985) (per curiam). The estate's election to assume a contract or lease under Section 365 entitles the other contracting party to assert its claims on a priority basis. Section 365 does not confer any power of election upon the other contracting party. Although LTV never expressly rejected Frito–Lay's safe-harbor leases pursuant to Section 365, LTV never elected (and never secured court approval) to assume those leases, as Paragraph 8.1 of the Plan clearly shows. The Plan was confirmed and is now substantially consummated. We are in no position, were we so inclined, to compel the Debtors to assume the safe-harbor leases *nunc pro tunc.*

Even so, a debtor sometimes may incur priority expenses under an executory contract or unexpired lease, without an express election, if the bankrupt estate derives benefits under that contract. *See In re Unishops, Inc.,* 553 F.2d 305, 308 (2d Cir.1977). Frito–Lay seeks the benefit of this equitable principle by attributing to the safe-harbor leases the post-petition tax benefits that LTV received upon disqualification of the relevant assets. We conclude, however, that LTV received no post-petition benefit *under the leases.*

Two things happened that together resulted in a benefit to LTV: LTV retired certain assets; and that act triggered tax consequences favorable to LTV. Neither event required Frito–Lay to do anything. LTV had full power to dispose of its assets before it signed the leases, and the leases simply acknowledge LTV's retention of that pre-existing power. LTV needed no consent from Frito–Lay to dispose of the qualified assets, and did not use any power conferred by the leases in doing so. The tax benefits that Frito–Lay enjoyed were conferred by the federal Tax Code, and did not spring from any as yet unperformed provision of the leases. Unquestionably, LTV visited a post-petition loss on Frito–Lay, but that is not the same thing as saying that Frito–Lay thereby conferred a contractual benefit on LTV or that a benefit was otherwise conferred on LTV under the leases. Frito–Lay was LTV's victim, but that status is not enough to support an administrative claim.

LTV's disqualification of assets resulted in tax benefits to LTV because the federal Tax Code treats disqualification as a repurchase of the asset by the seller/lessee. Frito–Lay argues that this repurchase, by which LTV is deemed to have acquired property from Frito–Lay, should be treated as an administrative claim as would any other post-petition transaction for the sale of business property. Although such a repurchase is *deemed* to have occurred (under Former Temp. Reg. §§ 5c.168(f)(8)–8(d)) rather than actually performed, Frito–Lay argues that the repurchase had real ramifications, conferred real benefits on LTV, and cannot be brushed aside as a legal fiction or construct. For example, all of the federal tax ramifications that have been so advantageous to LTV and so disadvantageous to Frito–Lay correspond to the consequences that would ordinarily flow from the repurchase of business property involved in a sale-leaseback transaction. Thus, the sale is real enough within the realm of the Tax Code, and it certainly creates real tax and accounting consequences. However, as we have already stated, the events that brought about the repurchase required no contractual performance by Frito–Lay and stemmed from the disposition of property that LTV at all times owned and had full power to sell or retire. Contrary to Frito–Lay's argument, the indemnification provisions of the safe-harbor leases do not constitute restrictions on LTV's unilateral power to dispose of the assets and do not give to Frito–Lay any interest in the assets; the indemnification clauses were necessitated precisely because the safe-harbor leases imposed no such restrictions on LTV and gave no such interest to Frito–Lay. Therefore, Frito–Lay's nominal resale of the leased assets cannot be said to have conferred the kind of post-petition benefit that will support an administrative priority claim in bankruptcy.

By reason of LTV's decision to retire the assets, Frito–Lay became entitled to an in-

demnification award to be paid on an impaired basis as a general unsecured claim, as the Plan provides. *See In re Hemingway Transport*, 954 F.2d 1, 8–9 (1st Cir.1992). We therefore affirm the district court's holding that—accepting without deciding that the Frito–Lay/LTV safe-harbor leases are executory contracts or unexpired leases—the debtors-in-possession neither assumed them nor received benefit under them, and that Frito–Lay's indemnification claims are not entitled to administrative priority pursuant to Section 365 and Paragraph 8.1 of the Plan.

■ Finally, Frito–Lay argues that its indemnification claims are entitled to priority as administrative expenses by virtue of Sections 503 and 507 of the Bankruptcy Code, 11 U.S.C. §§ 503, 507 (1988). It is well settled, however, that a claim will be afforded priority " 'only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.' " *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986) (*quoting In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976)). We have already determined, however, that the safe-harbor leases were entered into prepetition and that Frito–Lay provided no postpetition benefit to the debtors-in-possession. Rather, as the district court observed, Frito–Lay's claim for administrative priority boils down to an assertion that the debtors-in-possession took actions in the estate's best interest that left Frito–Lay in the position of being unable to satisfy for 100 cents on the dollar its rights under its pre-petition contracts. That merely subjected Frito–Lay to the kind of unfairness that Chapter 11 evenly distributes among similarly situated creditors.

We therefore conclude that LTV was entitled to judgment as a matter of law against Frito–Lay's request for administrative priority made pursuant to Sections 365, 503 and 507 of the Bankruptcy Code.

**B. Classification of Others' Indemnity Claims**

■ LTV entered into safe-harbor leases with a number of companies, some or all of which have asserted indemnity claims similar to those asserted by Frito–Lay. The Plan, which classifies Frito–Lay's indemnification claims as unsecured and impaired, classifies all of the other parties' similar claims as unimpaired. The justification offered for this disparity is that all of the indemnity claims—except Frito–Lay's—were secured by letters of credit or surety bonds issued by third-party financial institutions that subsequently furnished the estate with debtor-in-possession financing. For convenience, we will refer to these third-party letters of credit and surety bond arrangements collectively as guaranties.

Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C.A. § 1122(a) (1988). Frito–Lay challenges the determination by the bankruptcy court and by the district court that the Debtors had a rational basis for affording priority to the secured indemnity claims and for classifying them separately from Frito–Lay's unsecured claims. Because the relief Frito–Lay seeks is to gain priority treatment for itself, this issue is not moot on appeal for substantially the same reasons stated in our discussion of Frito–Lay's indemnity claims.

LTV's safe-harbor leases with companies other than Frito–Lay provide that throughout the duration of the agreements LTV must maintain guaranties in an amount equal to LTV's maximum potential indemnity obligations. Failure to renew those guaranties constitutes an event of default, entitling the secured lessors to accelerate and to draw upon the guaranties directly for the full amount of LTV's potential indemnification obligations. The guaranties thus assure that the secured lessors will be paid the full indemnity due under their safe-harbor leases, whether their claims are classified in the Plan as impaired or as unimpaired. Frito–Lay contends that the secured lessors cannot be treated as unimpaired because Frito–Lay suffered its tax loss in the same way and for the same reasons as did the other lessors and because the other lessors cannot be treated as "secured" because they hold none of

LTV's property as collateral. Although it is true that the other lessors are secured by obligations of third-party financial institutions, the debtors-in-possession agreed post-petition to reimburse those issuers fully for any draw-downs in order to induce the same issuers to provide the estate with hundreds of millions of dollars in debtor-in-possession financing. In this way, the Debtors were and continue to be obliged to reimburse the issuers of the guaranties 100 cents on the dollar for any draw-downs arising from LTV's secured indemnification obligations. That arrangement was approved by the bankruptcy court in 1987, after a hearing on full notice to all interested parties. We therefore agree with the bankruptcy court and the district court that the discriminatory terms of the Plan attacked by Frito–Lay have a rational basis.

### C. Estimation of the Secured Lessors' Claims

■ A bankruptcy court must estimate "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1) (1988). Pursuant to Section 502(c)(1), the bankruptcy court estimated Frito–Lay's contingent, general unsecured claims for indemnification, but found it unnecessary to estimate the secured lessors' contingent unimpaired claims. On appeal, Frito–Lay does not argue that the bankruptcy court improperly estimated its claims, but asserts rather that the court was additionally bound to estimate the secured lessors' claims. The clearly stated purpose of Section 502(c)(1) is to allow estimation of claims in order to avoid undue delay in the administration of bankruptcy proceedings; the Plan having been substantially consummated, Frito–Lay's argument that the secured lessors' claims should have been estimated is now moot.

### D. The Quasi Contract and Tort Claims

The bankruptcy court granted LTV's motion for summary judgment which, *inter alia,* dismissed Frito–Lay's claims for (1) conversion; (2) unjust enrichment; and (3) fraud. Frito–Lay appeals from the district court's June 9, 1993 affirmance of those rulings. For substantially the same reasons stated in our discussion of Frito–Lay's indemnity claims, Frito–Lay's quasi contract and tort claims have not been rendered moot on appeal.

We review grants of summary judgment *de novo. Healy v. Rich Products Corp.,* 981 F.2d 68, 72 (2d Cir.1992). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue does not exist "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citation omitted). We examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party. *See Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

■ Frito–Lay's claims for conversion and unjust enrichment are premised on the idea that the Debtors unlawfully appropriated tax benefits belonging to Frito–Lay. Under New York law, which the parties agree is controlling, a "denial or violation of the plaintiff's dominion, rights, or possession, is the basis of an action for conversion." *Sporn v. MCA Records, Inc.,* 58 N.Y.2d 482, 487, 462 N.Y.S.2d 413, 415, 448 N.E.2d 1324, 1326 (1983) (quoting 23 N.Y.Jur.2d *Conversion, and Action for Recovery of Chattel* § 3, at 210). "A conversion implies a wrongful act, a misdelivery, a wrongful disposition, or withholding of the property." *Magnin v. Dinsmore,* 70 N.Y. 410, 417 (1877). A quasi contract claim for unjust enrichment is based on "an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to

retain it, and which *ex æ quo et bono* belongs to another." *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337 (1916).

 Frito–Lay has introduced no evidence that it had a possessory interest, susceptible to conversion or unlawful appropriation, in any of the tax benefits associated with the retired, disqualified assets.[2] It is undisputed that (a) the Debtors retained the right to retire the qualified assets; and (b) once the retirements occurred, Frito–Lay retained no rights under the federal Tax Code to the tax benefits associated with the assets. The indemnity clause (requiring LTV to reimburse Frito–Lay for lost tax deductions and credits) is an implicit recognition of LTV's and Frito–Lay's respective rights. Moreover, Frito–Lay's successful assertion of its contractual right to that indemnification, even though its recovery has been impaired, is fatal to any quasi contractual claim: "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987) (citations omitted). It is also settled under New York law that a tort claim will not arise "where plaintiff is essentially seeking enforcement of the bargain." *Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 552, 583 N.Y.S.2d 957, 961, 593 N.E.2d 1365 (1992).

According to Frito–Lay's fraud claim, the Debtors misrepresented that the qualified assets were retired in 1987, causing Frito–Lay to overpay its 1987 federal income taxes. The representative safe-harbor leases define "retirement" as "the retirement from service of such item of [qualified] property by [LTV] or any other event or circumstance which may be defined as a retirement in the [temporary regulations or final regulations promulgated under Section 168(f)(8) of the Code]." After reviewing the record, we agree with Chief Judge Lifland that the evidence adduced by Frito–Lay at best raises a question as to whether the Debtors, pursuant to the Tax Code, *abandoned* the qualified

property in 1987. However, a finding that the Debtors did not abandon the property in 1987 would not support a finding that the Buffalo and Aliquippa assets were not otherwise *retired* in 1987. Frito–Lay's evidence therefore does not begin to satisfy its burden to raise a genuine question of fact as to whether the property was fraudulently retired.

In sum, the district court properly concluded that the Debtors were entitled to judgment as a matter of law dismissing Frito–Lay's claims sounding in quasi contract and tort.

### E. The Inland Steel Company Claim

 Inland Steel Company brought an action against the Debtors in the United States District Court for the Northern District of Illinois alleging post-petition patent infringement and seeking $200 million in damages, trebled. In the LTV bankruptcy proceedings, Inland moved to compel the Debtors to reserve fully for their contingent liability; the Debtors cross-moved for permission to estimate Inland's claims at zero for purposes of the Plan and the reserve. The Debtors and Inland ultimately stipulated that Inland's pending claim would remain unimpaired but unreserved, and presented that stipulation for bankruptcy court approval. On May 26, 1993, the bankruptcy court conducted a hearing to determine, *inter alia,* whether the Plan was feasible and should be confirmed. At the hearing, Chief Judge Lifland heard a detailed account of the Inland stipulation, reviewed the agreement, and permitted everyone in attendance to be heard on the subject. Frito–Lay, which was represented at the hearing, did not choose to be heard. The stipulation was so ordered without any objection.

In briefing before this Court, Frito–Lay protests that "*on the very eve of confirmation,* LTV entered into the Inland Settlement, which permitted potential claims of over $600,000,000 (*30 times greater than Frito–Lay's*) to survive post-bankruptcy" (emphases in original). Frito–Lay does not ar-

---

**2.** We do not reach the question of whether Frito–Lay has sufficiently pleaded the remaining elements of its claims for conversion and unjust enrichment.

gue that this feature of the Plan renders it unfeasible. Frito–Lay's appellate position is that "[t]he Plan should not have been confirmed", because the bankruptcy court somehow failed "sufficiently" to consider the impact that the Inland settlement might have on the Plan's feasibility.

On this record, we doubt that Frito–Lay preserved an objection to the Plan's feasibility, we doubt that Frito–Lay has standing to object to the Plan's feasibility (its claims presumably already having been paid, and its financial interest in the Plan's feasibility therefore eliminated), and we doubt that the bankruptcy court gave inadequate consideration to the Plan. We do not address any of those matters, however, because effective relief can no longer be fashioned. On June 28, 1993, LTV began consummation of the Plan, which entailed, among other happenings, the distribution of hundreds of millions of dollars in cash, common stock, preferred stock and warrants; the transfer of almost $1 billion in assets to creditors covered by restored pension plans; the merger and liquidation of corporate entities; the amendment of its certificate of incorporation and by-laws; and the recomposition of its Board of Directors. Frito–Lay's objection to the sufficiency of the bankruptcy court's consideration of the Plan's feasibility is now moot.

### F. The Reserve Requirement

The district court affirmed the bankruptcy court's June 7, 1993 ruling that LTV was not required to fund a reserve based on the full unimpaired value of Frito–Lay's indemnification claims. Frito–Lay maintains that the Plan requires reorganized LTV to establish full reserves for all litigated claims pending their final resolution. Aetna, in its appeal, argues that such reserves are required by the Bankruptcy Code and the United States Constitution as well as by the Plan. We will discuss all of the reserve arguments together as part of our consideration of Aetna's appeal.

### AETNA ISSUE

### A. Aetna's Claims for Administrative Priority

Prior to the Debtors' Chapter 11 filing, Aetna issued approximately 262 surety bonds on behalf of LTV to secure particular obligations of LTV, including payment of certain workers' compensation claims. After filing for bankruptcy, the Debtors defaulted on the workers' compensation claims that were subject to Aetna's surety bonds. Aetna has paid roughly $42 million to LTV employees under the surety bonds and has asserted bankruptcy claims in that amount as the subrogee of the employees. Under the Plan, Aetna's claims as subrogee are general unsecured claims and as such are impaired. However, claims submitted directly by LTV employees have been paid 100 cents on the dollar; and it is undisputed that workers' compensation claims submitted directly by LTV employees, in respect of the same injuries paid by Aetna, would have been paid on an unimpaired basis. Aetna maintains that there is no adequate rationale for distinguishing between (1) the derivative claims it asserted while standing in the shoes of injured LTV employees and (2) the direct claims of injured employees who filled their own shoes. In briefing before this Court, the Debtors offered the following rationale for the Plan's distinction:

> Any diminution in the payment of employee entitlements, such as these workers' compensation benefits, would adversely affect employee morale, would undermine labor-management relations and, as the Debtors' past experience indicates, could lead to a serious disruption of the Debtors' operations. Unlike the employees, whose continued assistance and cooperation is vital to the reorganization effort, Aetna has played and will play no productive role in the reorganization effort.

The bankruptcy court, in its May 25, 1993 order, held that the separate classification and different treatment of the workers' compensation claims was proper. We are told that Aetna's appeal of that decision is presently before the district court.

### B. The Reserve Requirement

Aetna's sole contention on appeal is that the Plan requires a reserve to be established on the books of reorganized LTV so that, if Aetna ultimately prevails on the merits of its

pending objections to the Plan, (1) the reorganized LTV cannot rely on the provision of the Plan that vests all assets "not being held for distribution" in reorganized LTV "free and clear of all claims and interests of creditors"; and (2) the reorganized LTV will have enough money to satisfy Aetna's claims.[3] The parties agree that setting up a reserve would require only an accounting entry. By order dated June 11, 1993, the district court affirmed the bankruptcy court's May 25, 1993 denial of Aetna's application for a reserve, and certified Aetna's request for an expedited appeal. On June 22, 1993, this Court permitted Aetna's appeal to proceed on an expedited basis.

1. *The Plan's Requirements.* The reserve requirement of the Plan is not easily summarized because it relies on terms that are defined elsewhere in the Plan by terms that are in turn further defined elsewhere. All told, there are thirteen paragraphs of definitions pertinent to the reserve question. After reviewing the reserve requirement and the related definitions, we agree with the district court that LTV was required to set up reserves only for claims that the Plan classified as unimpaired.

The Plan requires that reserves be established for timely-filed, disputed and pending claims that are in one of the classes categorized under the Plan as being unimpaired (the "Participating Unimpaired Classes"). A claim is disputed (a) if there is an objection as to the *amount* of the claim; or (b) if there is an objection as to the *priority* afforded the claim. With respect to disputes concerning amount, the bankruptcy court fixes the claim for reserve purposes. With respect to disputes concerning priority, a reserve must be established based on the highest claimed priority. Reserves must be established "in an amount equal to the aggregate Evaluated Disputed Claims in the Participating Unimpaired Classes as of the Effective Date." To understand that phrase, the reader must enter the maze of defined terms. After such a review, the district court held that a reserve is required only if the Plan categorizes the

disputed claim as already "in the Participating Unimpaired Classes." No reserve for Frito–Lay's and Aetna's disputed claims was therefore necessary.

According to Frito–Lay and Aetna, it is absurd to state that their priority claims must already have been categorized as "in one of the Participating Unimpaired Classes" since LTV's failure to so categorize their claims is the reason the claims are disputed.

Upon careful examination of the reserve requirement, we believe that the district court's interpretation is the only one that is tenable. The reserve requirement assures that a claimant who has already been placed in an unimpaired class, but whose status in that class is subject to an ongoing dispute (due to an objection, for example, by the estate or by an unsecured creditor), will not lose its already established priority and its ability to collect in full merely because another of the Plan's provisions denies payment of disputed claims on the effective date. The Plan does not require LTV to post reserves that presuppose the priority of every claim as to which priority has been asserted. Otherwise, general unsecured claimants asserting priority could obstruct consummation of the Plan pending appellate review by requiring the establishment of reserves so large as to preclude a fresh start.

■ 2. *Bankruptcy Code and Constitutional Requirements.* Aetna argues in the alternative that if the Plan itself does not expressly require the Debtors to set up a reserve, then such a provision must be read into the Plan in order for it to comply with the Bankruptcy Code and the United States Constitution. Under Paragraph 5.4B of the Plan, all funds not distributed when the Plan goes into effect vest in the reorganized LTV "free and clear of all claims and interests of creditors." Aetna argues that Paragraph 5.4B, absent some mechanism to ensure full recovery to a party that first succeeds in establishing its priority status on appeal, is incompatible with Bankruptcy Code Section 1129(a)(9)(A), which requires full cash payment of all administrative claims, 11 U.S.C.

---

**3.** For substantially the same reasons stated in our discussion of Frito–Lay's indemnity claims, Aetna's appeal has not been rendered moot.

1129(a)(9)(A) (1988). Aetna thus contends that its appellate rights under the Code are rendered meaningless, in violation of the Constitution's right to due process.

Aetna's argument is vastly overdrawn. A claimant in Aetna's position may seek to stay a plan's confirmation pending appeal; Aetna has argued unsuccessfully for such a stay to the bankruptcy court, the district court, and a prior panel of this Court. In addition, as our discussion of mootness makes plain, the granting of effective relief is not necessarily foreclosed by the substantial consummation of a reorganization plan. But neither the Bankruptcy Code nor tenets of due process require that a reorganized company in effect bond an appeal by a losing claimant.

Having determined that neither the Bankruptcy Code, the United States Constitution nor the Plan require LTV to reserve fully for claims pending appeal, we refuse otherwise to grant such relief.

## CONCLUSION

All judgments of the district court herein appealed from are affirmed.