**In re BRIDGEPORT JAI ALAI, INC., Debtor.**

**BRIDGEPORT JAI ALAI, INC., Movant,**

**v.**

**AUTOTOTE SYSTEMS, INC., Autotote Corporation, and Autotote Enterprises, Inc., Respondents.**

**Bankruptcy No. 96–51183.**

United States Bankruptcy Court, D. Connecticut.

Dec. 29, 1997.

James G. Verrillo, Stephen M. Kindseth, Zeisler & Zeisler, P.C., Bridgeport, CT, for Movant.

Robert D. Tobin, Rita Provatas, Tobin, Carberry, O'Malley, Riley & Selinger, P.C., New London, CT, Richard F. Casher, Peter M. Nolin, Hebb & Gitlin, Hartford, CT, for Respondents.

Charles M. Needle, Ann M. VanDeventer, Zeldes, Needle & Cooper, Bridgeport, CT, for Bridgeport Jai Alai Associates and A. Robert Zeff.

Elizabeth Austin, Pullman & Comley, Bridgeport, CT, for Official Committee of Unsecured Creditors.

Linda A. Russo, Assistant Attorney General, Hartford, CT, for Connecticut Departments of Labor and Revenue Services.

Robert Vacchelli, Assistant Attorney General, Hartford, CT, for Connecticut Division of Special Revenue.

Carol A. Felicetta, New Haven, CT, for United States Trustee.

## MEMORANDUM AND ORDER ON MOTIONS UNDER § 365(a)

ALAN H. W. SHIFF, Chief Judge.

Bridgeport Jai Alai, Inc. ("BJA"), Bridgeport Jai Alai Associates, and A. Robert Zeff (the "Proponents") seek confirmation of their Third Amended Plan of Reorganization dated December 11, 1997 (the "Plan"). At the confirmation hearing on December 10 and 11, 1997, it was determined that the Plan complied with all of the provisions of § 1129(a), and the court reserved decision on BJA's motions under § 365(a) which the Proponents concede are essential to confirmation of the Plan. This decision is limited to that issue.

BJA seeks approval under § 365 to reject its contract with Autotote Systems, Inc. ("Systems") dated September 9, 1995 and a letter amendment thereto dated September 11, 1995 (collectively the "1995 Agreement"), and to assume its contract with Autotote Enterprises, Inc. ("Enterprises") dated October 29, 1992 and the letter amendment thereto dated June 2, 1993 (collectively the "1993 Agreement"). BJA asserts that those documents are separate and distinct executory contracts that may be individually assumed or rejected. Autotote Corporation, Autotote Enterprises, Inc., and Autotote Systems, Inc. (collectively "Autotote") have objected, contending that the documents constitute an indivisible integrated executory contract which must be either assumed or rejected in its entirety. For the following reasons, BJA's motions are granted.

## BACKGROUND

On July 16, 1996, BJA filed a chapter 11 petition. On September 18, 1997, it filed a First Amended Disclosure Statement and Plan which, *inter alia*, proposed to assume and reject certain contractual arrangements. On September 29, an order entered which approved the First Amended Disclosure Statement and set October 28 as a bar date for filing objections to the First Amended Plan. On October 27, Autotote filed an objection that the First Amended Plan failed to comply with § 365 as it proposes "to accept in part and reject in part an executory contract, including its amendments." On December 10, the first day of the confirmation hearing, the Proponents filed a Second Amended Plan which addressed some of the objections to the First Amended Plan, including the objections of the Connecticut Departments of Labor and Revenue Services and the Division of Special Revenue, which oversees and regulates gaming operations.[1]

On December 11, during the confirmation hearing, the Proponents filed the Plan. Autotote objected, contending that it materially modified the previous plans by reducing the number of racing days and omitting the con-

dition that A. Robert Zeff, a shareholder and officer of BJA, comply with the licensing regulations of the Connecticut Gaming Policy Board. Autotote argued that since those changes were material, it should not be held to the October 28 bar date for objections.

The court ruled that Autotote would be permitted to supplement its objection to the Plan if either of the amendments were found to be material with respect to either of those two isolated changes. After hearing the evidence offered by the Proponents and Autotote and the arguments of counsel, the court determined that while the reduction in race days was not a material modification, the licensing issue was material to a determination of the feasibility of the Plan.

With respect to that issue, the court heard testimony from the State of Connecticut, Division of Special Revenue (the "Division") and a statement by Robert Vacchelli, Esq., Assistant Attorney General for that Division, that BJA is currently licensed to operate its gaming facilities. Peter Nolin, Esq., attorney for Autotote, conceded that point in the following colloquy with the court:

> The Court: .... The organization is licensed and there is no license defect ... that prevents them from operating. There's nothing in the licensing requirements that prevents this entity from operating.
>
> Mr. Nolin: With that statement, I have to agree, your honor.

*Confirmation Hearing, 12/11/97, Tape 3 at # 248–81.*

■ While it may be that the future of BJA's operating licenses cannot be absolutely assured, neither does it have to be. A plan should not be denied confirmation for lack of proof of feasibility, *see* § 1129(a)(11), by the mere prospect of an event which would impact a debtor's continued operation. *See Kane v. Johns–Manville Corp., (In re Johns–Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) (citations omitted) ("Success need not be guaranteed"). *See also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R.

---

1. Objections to the First Amended Plan were also filed by creditors Paul Weintraub, O & G Industries, Inc., and Mark IV Construction Co., Inc. Those objections have been resolved by the amendments to the Second Amended Plan and the Plan.

723, 762 (Bankr.S.D.N.Y.1992) (Section 1129(a)(11) merely safeguards against the confirmation of plans which are "visionary or speculative"). To rule otherwise in this case would require the court to speculate on the outcome of any future licensing issues. Few cases would survive such a feasibility analysis. Instead, the court will be guided by the clear and frequent signals from the Supreme Court and the Court of Appeals for the Second Circuit that the bankruptcy code should be read broadly to insure that the prospects of reorganization are not prematurely thwarted. *See, e.g., Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership et al.,* 507 U.S. 380, 389, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993) (citation omitted) ("... [B]ankruptcy courts are necessarily entrusted with broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of ensuring the success of the reorganization"); *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 837 F.2d 89, 93 (2d Cir.1988), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) (liberal construction of court's power to enjoin suits that "might impede reorganization process"). The court therefore ruled that, notwithstanding the licencing issue raised by Autotote, "... the plan is not likely to be followed by

the liquidation, or the need for further financial reorganization, of the debtor ...". *See* § 1129(a)(11). As noted, the court further found that the Plan satisfied all of the other requirements of § 1129(a) with the exception of the debtor's motions under § 365(a), which implicate § 1129(a)(1).

### *Motions Under § 365(a)*

On October 9, 1997, BJA filed motions to assume the 1993 Agreement and reject the 1995 Agreement. On October 23, Autotote filed an untimely objection which asserted the same § 365 issue raised by its objection to the First Amended Plan, *see supra* at 653.[2] The issue addressed here is whether the 1993 Agreement and the 1995 Agreement constitute separate and distinct executory contracts which may be assumed or rejected individually or whether they must be read together as a single indivisible contractual obligation which must either be assumed or rejected.

On December 5, 1997, the parties filed the following Stipulation.

1. Originally, the State of Connecticut maintained the right to operate the Connecticut Off–Track Betting System....

---

2. As appears from the record, Autotote was limited to the objection it filed on October 23. The following is a brief recital of subordinate findings which led to that conclusion.

BJA and Autotote prepared and signed a proposed pre-trial order, which was amended twice. Although each proposed pre-trial order was filed, none entered. Each of the proposed pre-trial orders established October 20 as the bar date for filing responses to BJA's § 365 motions. On October 23, Autotote filed an objection, the timeliness of which was not challenged by BJA. On December 1, Autotote filed a supplemental objection which expanded the scope of its prior objection to include BJA's inability to provide adequate assurance under § 365(b)(1)(C), raised issues relating to unresolved licensing concerns, and alleged certain "material, incurable, non-monetary defaults" under the 1993 Agreement.

In an apparent effort to seek court approval of its December 1 objection, on December 3, Autotote filed a Motion for Entry of Order Under F.R.Bankr.P. 9014 to Fix December 1, 1997 as the Deadline for Filing a Response to Debtor's Motion to Assume. BJA and the Official Unsecured Creditors' Committee ("Committee") objected.

BJA claimed that it would be "extremely prejudiced" by any delay of the confirmation hearing because the success of its racing operations depended upon the confirmation of a plan by the end of the year. BJA noted that while the proposed pre-trial orders had not entered, Autotote was nonetheless bound because the proposed orders constituted stipulations between Autotote and BJA from which Autotote could not unilaterally withdraw.

The Committee argued that Autotote, as a member of the Committee since its inception, had access to substantial financial information furnished by BJA. Autotote was also a party to negotiations with BJA that recognized the need for confirmation of a plan by the end of the year.

Autotote countered that the so-called "stipulation" was merely a "scheduling vehicle" which should not limit further objections. The court concluded that the scheduling agreement was a stipulation and agreed that a party may not unilaterally withdraw from its constraints, unless it violated public policy. After the Division represented that the First Amended Plan did not violate public policy, the court sustained the objections of BJA and the Committee.

2. Under the OTB system, certain off-track wagering facilities could be operated. Each facility permits patrons to place wagers on events, such as horse and dog races, held at off-site tracks. The off-site racing performances are transmitted to each OTB facility and shown on closed circuit televisions.

3. The OTB system may include up to eighteen OTB facilities, known as "branches." Thirteen branches of the eighteen are now operational. Eleven are operated by [Enterprises], a wholly owned subsidiary of Autotote Corporation ["Corporation"]. [Enterprises] owns all eighteen of these branches. BJA and the owners of the Plainfield dog track operate their two facilities under contract. Conn.Gen.Stat. § 12–571a (1997 Supp.) authorizes BJA and Plainfield to operate OTB facilities at their dog tracks.

4. Effective December 2, 1992, BJA entered into a contract (the "OTB Agreement") with the [the Division] whereby BJA was authorized and empowered to operate an OTB simulcast facility at its Bridgeport entertainment center. As part of the consideration, BJA paid a fee equal to a percentage of the net-off track betting per calendar year handle (total sales less cancellations and refunds) with respect to wagers placed....

5. The equipment necessary to BJA's simulcast operation, including totalisator hardware and software, monitors, data communication lines, and ticket issuing machines, is known collectively as a totalisator system.

6. [Systems], a subsidiary of [Corporation], and the [Division] entered into a separate contract for [Systems] to provide the totalisator services for BJA's simulcast operation. The [Division] paid a fee for these services. Under the OTB Agreement, BJA reimbursed the [Division] for the cost of the totali-

sator services for the OTB simulcast operation.

7. The OTB Agreement also provides that the Division shall not assign its right under the contract without the consent of BJA, which cannot be unreasonably withheld.

8. During 1993, [Corporation] sought to acquire the OTB system from the State of Connecticut. [Corporation] is a Delaware Corporation.

9. [Corporation] and BJA entered into a certain letter amendment ("Letter Amendment") to the OTB Agreement dated June 2, 1993....[3]

10. The Letter Amendment:
 a. Extended the term of the OTB Agreement for five years after its 1995 expiration, with renewal options;
 b. Provided an area of exclusivity whereby simulcast facilities could not be operated by [Corporation]; and
 c. Provided that [Corporation] shall provide the installation and operation of a totalisator system for the OTB simulcast facility and dog track, if any, at the lowest prices and upon the best terms and conditions made available by [Corporation] at other unaffiliated dog tracks having a handle whose volume is comparable to that of BJA, and which are serviced by [Corporation] at any location ["Most Favored Nation Rate"]. ["Paragraph 5"]

11. At the time of the Letter Amendment, BJA did not operate a dog track, but hoped to build one in the near future.

12. [Corporation] was the successful bidder for the OTB system. [Corporation] formed [Enterprises] to own and operate the OTB system. After acquiring the OTB system from the State of Connecticut, [Corporation] assigned its rights to the OTB system

---

**3.** As defined *supra* at 653, the OTB Agreement referred to in ¶ 4 together with the Letter Amendment constitute the 1993 Agreement.

and the OTB Agreement, as amended, to [Enterprises].

13. During 1995, BJA anticipated completing construction of a dog track and expected to commence greyhound racing later in the year. At the greyhound dog track, patrons would view and place wagers on the greyhound races.

14. BJA and [Corporation] attempted to negotiate the terms of a totalisator agreement for the dog track which would comply with the provisions of Paragraph 5, specifically, the provisions requiring that [Corporation] provide totalisator services at the lowest prices and upon the best and conditions made available by [Corporation] at unaffiliated dog tracks having a handle comparable to BJA and which are serviced by [Corporation].

15. A significant impediment arose since BJA had no handle for greyhound racing to compare to, and could only provide handle estimates. At first, the parties considered language which would have postponed implementing the lowest and best rate provision for six months until the handle for the greyhound racing could be determined. The parties eventually abandoned this proposal.

16. Due to the difficulty in complying with the [Most Favored Nation Rate] provision of [P]aragraph 5 of the Letter Amendment, BJA and [Systems] proposed a contract dated September 9, 1995 ("Totalisator Services Agreement") for [Systems] to provide totalisator installation and operation services for the greyhound racing at fixed percentages depending upon the amount of the handle.

17. The Totalisator Services Agreement also set a weekly minimum and an annual minimum in the amount of $375,000 to be paid to [Systems] for the totalisator services.

18. To resolve any issue concerning [Corporation's] obligation to provide tota-

lisator services for the dog track at the [Most Favored Nation Rate], the parties originally considered language in the Totalisator Services Agreement providing that [P]aragraph 5 of the Letter Amendment "shall be of no further force or effect with respect to any greyhound racing" for the term of the Totalisator Services Agreement. BJA crossed this provision out of the final version of the Totalisator Services Agreement and returned the Totalisator Services Agreement to [Systems]. . . .

19. By letter dated September 11, 1995, the parties subsequently incorporated the following language into Section 1.B(i) of the Totalisator Services Agreement: 'Any and all provisions for the June 2, 1993 Letter of Agreement are in no way superseded by any terms of the September 9, 1995 contract with the exception of the rate schedule for the term of the Contract. . . .'[4]

20. BJA operated the dog track from November 1, 1995 through December 1, 1996 when BJA ceased its greyhound racing operation. During that time, BJA and [Systems] performed pursuant to the Totalisator Services Agreement and the September 11, 1995 letter.

## DISCUSSION

In *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (emphasis added), the United States Supreme Court stated:

Property interests are created and defined by state law. *Unless some federal interest requires a different result,* there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

Accordingly, Connecticut law must be applied to determine whether the 1993 Agreement and the 1995 Agreement are entire or divisi-

---

**4.** As defined *supra* at 653, the Totalisator Services Agreement referred to in ¶ 16 together with

the letter dated September 11, 1995 constitute the 1995 Agreement.

ble, unless there is a contrary federal interest.

■ Connecticut law provides:

As a general rule, it may be said that a contract is entire, when by its terms, nature, and purpose, it contemplates and intends that each and all of its parts and the consideration shall be common each to the other, and interdependent. On the other hand, it is the general rule that a severable contract is one in its nature and purpose susceptible of division and apportionment. The determinative test is in ascertaining from the language used, read in the light of the surrounding circumstances, what was the intention of the parties.

*Hartford–Connecticut Trust Co. v. Cambell*, 95 Conn. 399, 405, 111 A. 864 (1920) (citations and internal quotation marks omitted). *See also Venture Partners, Ltd. v. Synapse Technologies, Inc.*, 42 Conn.App. 109, 118, 679 A.2d 372 (1996) (citations and internal quotation marks omitted).[5]

■ Under federal law, a debtor in possession, "subject to the court's approval, may assume or reject any executory contract ... of the debtor." *See* §§ 365(a) and 1107(a). Under § 365(a), the debtor must assume such an executory contract in its entirety, including any attendant burdens. *National Labor Relations Board v. Bildisco and Bildisco*, 465 U.S. 513, 531–32, 104 S.Ct. 1188, 1198–99, 79 L.Ed.2d 482 (1984) (citation omitted); *Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir.1996). As the Second Circuit observed: "The main purpose of Section 365 is to allow a debtor to reject executory contracts in order to relieve the estate of burdensome obligations while at the same time providing a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise

make them reluctant to do so." *Frito–Lay Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 954–55 (2d Cir.1993) (citation and internal quotation marks omitted). *See also Medical Malpractice Insurance Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386 (2d Cir.1997) (citation and internal quotation marks omitted) ("[T]he trustee is allowed to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

■ As noted *supra* at 654, the court is "necessarily entrusted with broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of ensuring the success of the reorganization." *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership et al., supra*, 507 U.S. at 389, 113 S.Ct. at 1495. Towards that end, the bankruptcy code permits a debtor in possession to assume or reject executory contracts. *See* §§ 365(a), 1107(a). If such a contract is rejected:

Section 365(g) addresses the effect of rejection upon a contract. If the contract has not been previously assumed, rejection of the debtor's executory contract constitutes a breach of the contract. While rejection is treated as a breach, it does not completely terminate the contract. Thus, rejection merely frees the estate from the obligation to perform; it does not make the contract disappear.... The debtor's obligations are unaffected, and provide the basis for a claim ... for breach of contract in the non-debtor party. The claim is treated as a pre-petition claim, affording creditors their proper priority.

*In re Lavigne, supra*, 114 F.3d at 386–87 (citations and internal quotation marks omitted) (footnote omitted). Therefore, even if

---

**5.** No Second Circuit authority has been found or been cited by the parties that construes the severability of a contractual arrangement under Connecticut law, but in interpreting New York law, which is essentially the same on this issue, the court has stated:

> The severability of a contract is a question of the parties' intent, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding

> them at the time they contracted. As a general rule, the contract is considered severable and divisible when by its terms, nature, and purpose, it is susceptible of division and apportionment.

*Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l Limited*, 85 F.3d 68, 81 (2d Cir.1996). *See also Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 233 (2d Cir.1991).

the application of Connecticut law results in the conclusion that the 1993 Agreement and the 1995 Agreement are indivisible contractual arrangements, that result would not prevail against an overriding federal interest, which in this case is the qualified rights and obligations provided by § 365.

 After an analysis of the stipulated facts and the text of the contract language together with a consideration of the arguments of counsel, it is determined that the agreements are separate and distinct contracts under Connecticut law. Apart from an obvious distinction that the two agreements were entered into at different times, which is of some significance but clearly not dispositive, a significant distinction is the fact that the parties to each agreement are different. The 1993 Agreement is between BJA and Enterprises while the 1995 Agreement is between BJA and Systems. It is also significant that there is no language in the 1995 Agreement which states that it is an amendment of the 1993 Agreement. In fact, the letter dated September 11, 1995, a component of the 1995 Agreement, *see* n. 4 *supra* at 656, is the only evidence that links the two contracts and its sole provision states: "Amendment #1 to Totalisator Service Agreement dated September 9, 1995: Any and all provisions of [the 1993 Agreement] are in no way superseded by any terms of the [1995 Agreement] with the exception of the rate schedule for the term of the [1995 Agreement]." *Exh. D to Court's Exh. A. See also supra* at 656, ¶ 19. The language expressly contemplated that the agreements should not be interrelated but treated as separate contracts with the exception of the fees to be paid by BJA for totalisator services under both agreements. It is clear that if the parties intended to merge the two agreements, they would have employed clear language to that effect. Instead the language that was drafted is contrary to Autotote's position.

Moreover, the 1993 Agreement authorized BJA to operate an OTB simulcast facility. It also contemplated providing totalisator services to BJA for its OTB simulcast facility and the on-site dog track facility.[6] *See Exh. B to Court's Exh. A. See also* Paragraph 5, *supra* at 655, ¶ 10c. Those services were to be provided at the so-called "Most Favored Nation Rate." *Id.* In contrast, the 1995 Agreement was a service contract under which totalisator services were provided for the on-site dog track facility for a fee based on a fixed rate, which varied in relation to the handle. The fixed fee arrangement under the 1995 Agreement was also applied to determine the value of totalisator services under the 1993 Agreement.

Autotote contends that the application of that fixed rate to both agreements links the two agreements into a single contract which cannot be assumed or rejected in part. Autotote further argues that the Most Favored Nation Rate in the 1993 Agreement was superseded by the fixed rate in the 1995 Agreement prior to bankruptcy and cannot be revived by BJA's assumption of the 1993 Agreement. BJA concedes that the 1995 Agreement applied the fixed rate fee to both agreements, but argues that uniformity did not merge the agreements and, in any case, was only applicable for the term of the 1995 Agreement. BJA stresses the fact that the fee provisions in the 1995 Agreement were only intended to be applicable "for the term of the Contract," at which time the superseded fee provision of the 1993 Agreement, i.e., the Most Favored Nation Rate, would be revitalized.

It is noted that the superseding language in the 1995 Agreement was only applicable for the term of that agreement. *See Exh. D to Court's Exh. A. See also supra* at 656, ¶ 19. While the stated termination of the 1995 Agreement is October 28, 2000, that agreement would also terminate by operation of law upon its rejection under § 365(a).

---

6. On December 10, 1997, after the close of evidence on BJA's § 365 motions, a dispute arose as to whether different equipment was utilized to provide totalisator services to both the simulcast and dog track facilities. The court accepted offers of proof by BJA and Autotote on totalisator operating equipment for the on-site greyhound and off-track simulcast races. On the basis of that proof, it is found that even if the hardware and software components of the equipment is the same for both operations, additional equipment and personnel were required and provided for on-site racing as evidenced by Schedule A to the Totalisator Agreement. *See Court's Exh. A.*

Autotote's argument that because the 1995 Agreement applied the fixed fee rate for totalisator services to the 1993 Agreement, the two agreements were linked, is also unpersuasive. The evidence establishes that a better reading of the agreements is that the 1995 Agreement established a different method to calculate payment for totalisator services for the life of that contract, and at the end of the contract, whether by the expiration of its terms or by operation of law, the original method of fee computation would be used. That reading establishes two contracts with two different fee arrangements during two time periods. It is reinforced by the fact that the 1995 Agreement resorted to a fixed fee computation because BJA lacked a handle from which the Most Favored Nation Rate could be calculated. *See supra* at 656, ¶ 14–16.

Apart from the conclusion that the agreements are separate and distinct contractual obligations under Connecticut law, it is also determined that BJA's right to reject the 1995 Agreement and assume the 1993 Agreement, as an integral part of its effort to reorganize, is protected by the federal interest provided by §§ 365 and 1129(a)(1) and enunciated by *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership et al., supra,* 507 U.S. at 389, 113 S.Ct. at 1495, *In re Lavigne, supra,* 114 F.3d at 386, and *In re Chateaugay Corp., supra,* 10 F.3d at 954–55.

## ORDER

Accordingly,

IT IS ORDERED THAT the motion to assume the 1993 Agreement is granted; and

IT IS FURTHER ORDERED THAT the motion to reject the 1995 Agreement is granted.