IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-41032
_____


In The Matter Of: US BRASS CORP

                                        Debtor

THE INSURANCE SUBROGATION CLAIMANTS

                                        Appellant

                    versus

US BRASS CORP; SHELL OIL COMPANY; HOECHST CELANESE
CORPORATION; OFFICIAL POLYBUTYLENE CREDITORS COMMITTEE;
ELJER INDUSTRIES INC; ELJER PLUMBINGWARE INC

                                        Appellees



_____

Appeal from the United States District Court
for the Eastern District of Texas
_____

March 12, 1999

Before HIGGINBOTHAM, BARKSDALE, and DENNIS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Insurance Subrogation Claimants appealed an order of
confirmation of a Chapter 11 reorganization plan proposed by U.S.
Brass, the debtor, and its direct parents, Eljer Manufacturing,
Inc., and EMI's parent Eljer Industries, Inc.  The ISC contend that
the plan violates 11 U.S.C. § 1123(a)(4), which requires all
creditors within a class be treated the same, unless the creditor

who is being treated less favorably agrees to less favorable treatment. The ISC also argue that the plan was not proposed in good faith under 11 U.S.C. § 1129(a) and should not have been approved.

Shell and U.S. Brass have moved to dismiss ISC's appeal as moot. We agree, and finding the plan substantially implemented and effective relief unattainable, dismiss the appeal.

I

On May 23, 1994, U.S. Brass filed for Chapter 11 relief in the Eastern District of Texas. Prior to the petition date, U.S. Brass had been sued in hundreds of cases seeking damages from alleged defects associated with a polybutylene plumbing system. During the pendency of the Chapter 11 case, a global settlement of the PB litigation was fashioned in an action styled <u>Tina Cox, et al. v. Shell Oil Co., et al.</u>, Civil Action No. 18,844, with the Chancery Court for Obion County, Tennessee. The <u>Cox</u> court certified the <u>Cox</u> Plaintiffs as a national settlement class. The ISC were not members of the settlement class.

In November 1995, the <u>Cox</u> court approved a settlement agreement between the <u>Cox</u> Plaintiffs and Shell and Celanese and authorized the parties to pursue contributions from U.S. Brass. A contribution plan was negotiated and is incorporated into the plan as the <u>Cox</u> Plaintiffs' Settlement Agreement.

The Cox Plaintiffs and the ISC are designated as Class 5 claimants in the reorganization plan. The Cox Plaintiffs' Settlement Agreement, however, provides a settlement of all Cox Plaintiffs' claims in exchange for a cash contribution from the Brass Trust of $37.4 million and 80% of the Brass Trust's recoveries from insurance coverage to the settlement fund. The remaining 20% is available for the other Class 5 claimants like the ISC.

On September 30, 1997, the bankruptcy court approved U.S. Brass' Fourth Amended Disclosure Statement and on January 27-29, 1998, held a confirmation hearing. The bankruptcy court overruled the ISC's objections and confirmed the plan and the incorporated settlements, including the Cox Plaintiffs' Settlement Agreement. The Cox court in Tennessee, in turn, entered a final order on February 5, 1998, approving the Cox Plaintiffs' Settlement Agreement and authorizing the Cox Plaintiffs to consummate the transactions contemplated in the plan.

On February 24, 1998, the bankruptcy court entered its order confirming the reorganization plan and it became effective March 6, 1998. On the same day, the ISC filed a notice of appeal to the district court of the confirmation order. Here begins the path to mootness. The ISC also filed a motion for limited stay pending appeal with the bankruptcy court requesting the bankruptcy court to enjoin any funding from the Brass Trust to the Cox Plaintiffs or to the Consumer Plumbing Recovery Center, the entity that administers

3

the $950 million settlement from Shell and Celanese. The ISC did not seek emergency or expedited consideration of the bankruptcy court's order.

The reorganization plan proceeded, and on March 19, 1998 the following events occurred:

    (1)    The Brass Trust was created pursuant to § 7.1 of the plan;

    (2)    nearly $5 million was distributed to pay the holders of allowed administrative, priority and general unsecured claims;

    (3)    Eljer wired more than $48 million into the Brass Trust;

    (4)    the Brass Trust paid more than $32 million to the CPRC for distribution to holders of allowed plumbing claims;

    (5)    various global settlement agreements and releases were signed by the major participants in the Chapter 11 case, such as the Cox Plaintiffs' Settlement Agreement, the Shell/Celanese Settlement Agreement, and the Brass Settlement Agreement;

    (6)    the Eljer note was executed; and

    (7)    U.S. Brass and its parents assigned all their right, title, and interest to certain insurance proceeds to the Brass Trust.

On March 26, 1998, U.S. Brass filed an objection to the ISC's motion to stay, urging that the plan was now substantially consummated. The bankruptcy court held a hearing on the stay motion on May 6, 1998. Although no ruling came forth, the ISC did nothing and on July 27, 1998, the district court affirmed the bankruptcy court's confirmation of the plan.

4

On August 25, 1998, the ISC filed a notice of appeal to this court. Then finally on September 17, 1998, the ISC filed a motion to stay and a request for expedited consideration with the district court. The district court never ruled on the stay motion.

The ISC did nothing until January 21, 1999, almost four months after appealing the confirmation of the plan to this court. The ISC requested that this court stay further proceedings pending appeal in this court. We must determine whether this appeal is moot considering the failure of the ISC to obtain a stay, the action taken toward implementing the plan, and the potential effect of the ISC's requested relief on the plan.

II

When evaluating whether an appeal of a reorganization plan in a bankruptcy case is moot, this court examines whether (1) a stay has been obtained, (2) the plan has been substantially consummated, and (3) the relief requested would affect either the rights of parties not before the court or the success of the plan. See In re Manges, 29 F.3d 1034, 1039 (5th Cir. 1994); In re Berryman Products, Inc., 159 F.3d 941, 944 (5th Cir. 1998). Shell and U.S. Brass argue that each of the factors favor finding the ISC's appeal moot.

1. *Failure to Obtain a Stay*

To date, the ISC have not obtained a stay. U.S. Brass and Shell argue that the ISC's efforts in pursuing a stay have not been diligent. For example, the first stay requested by the ISC, on March 6, 1998, was made without a request for expedited consideration even though the bankruptcy court had already confirmed the plan on January 29, 1998. Similarly, although the district court affirmed the plan on July 27, 1998, the ISC waited until September 17, 1998 to seek a stay from the district court. The district court never ruled, and the ISC never sought further action on this second stay request until January 21, 1999, when the ISC filed a motion for stay with this court. U.S. Brass and Shell maintain that the ISC's failure to obtain a stay and its lack of diligence militates in favor of dismissal for mootness.

This court has recognized that "the failure or inability to obtain a stay pending appeal carries the risk that review might be precluded on mootness grounds." Manges, 29 F.3d at 1040. In this case, it is undisputed that the ISC have failed to obtain a stay. We turn to the transactions that have taken place as a consequence to determine the extent to which the plan has been implemented.

2. *Substantial Consummation of the Plan*

The second question in the mootness inquiry is whether the plan has been substantially consummated. According to 11 U.S.C. §1102(a):

"[S]ubstantial consummation" means--

6

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan;  and
>
> (C) commencement of distribution under the plan.

"'Substantial consummation' is a statutory measure for determining whether a reorganization plan may be amended or modified by the bankruptcy court." Manges, 29 F.3d at 1040.  This court may "decline to consider the merits of confirmation when a plan has been so substantially consummated that effective judicial relief is no longer available--even though the parties may have a viable dispute on appeal."  Berryman, 159 F.3d at 944.

The parties dispute whether the plan has been substantially consummated.  In the absence of a stay pending appeal, U.S. Brass, the Brass Trust, the CPRC, and various other parties in interest have proceeded to implement the plan.  Shell and U.S. Brass argue that the events following the March 1998 confirmation demonstrate how extensively the plan has been implemented.  The following actions, for example, have occurred since the ISC sought a stay pending appeal in the district court:

> (1) U.S. Brass has continued to operate as a reorganized entity;
>
> (2) U.S. Brass has paid in full all of the outstanding debt owed to its debtor-in-possession financing lender;

7

(3) U.S. Brass and EII have implemented a new financing arrangement whereby EII provides operating funds to U.S. Brass;

(4) the bankruptcy court has entered orders providing the final allowance to Class 4 general unsecured claims;

(5) U.S. Brass has amended its state charter and by-laws as required by the plan;

(6) a number of state lawsuits against EMI and EII asserting plumbing claims have been dismissed with prejudice;

(7) the Brass Trust has transmitted checks in the sum of $267,978.45 as offers of full settlement to the convenience class claimants;

(8) the Brass Trust has opened bank accounts, established an account record system, implemented an investment program for excess funds, obtained insurance coverage, established by-laws, and retained professionals to carry out its duties;

(9) the Brass Trust, the CPRC, and Goldin Associates, the financial advisors to the Brass Trust, have established a claim resolution system to process allowed claims;

(10) the CPRC has distributed to holders of allowed plumbing claims all of the funds transferred by the Brass Trust to the CPRC;

(11) Shell and Celanese, in reliance on the Confirmation order and pursuant to the terms of the Shell/Celanese Settlement Agreement, which was incorporated into the plan, have released asserted claims against U.S. Brass in excess of $1 billion for a payment of $2.5 million and have increased their commitment to the Cox Settlement from $850 million to $950 million.

U.S. Brass claims that all of the elements of "substantial consummation" have occurred because on March 19, 1998, U.S. Brass emerged as a newly reorganized entity and, as the Closing Binders

8

make clear, "(I) distributions commenced (with the transfer of more than $48 million to the CPRC and the payment if more than $5 million to holders of allowed administrative, priority and general unsecured claims), and (ii) substantially all the property to be transferred under the plan was transferred (i.e. U.S. Brass assigned to the Brass Trust all of their right, title and interest to certain insurance recoveries)." Shell and U.S. Brass maintain that these transactions cannot be "unscrambled" and should weigh in favor of mootness.

The ISC reply that the plan has not been so substantially consummated that effective relief is no longer available. The relief the ISC seek would require the Brass Trust to reallocate its future disbursements of insurance recoveries pro-rata among all Class 5 claimants, instead of the present 80%/20% plan. In order to effectuate this relief, the ISC propose removing the Cox Plaintiffs' Settlement Agreement from the plan. Shell and U.S. Brass contend that removing the Cox Plaintiffs' Settlement Agreement from the plan would dismantle the plan.

We find the transactions that have taken place to date, the exchange of mutual releases, the disbursements already made, and the general implementation of the plan by all the involved parties evidence substantial consummation of the plan. This determination, however, does not end the mootness inquiry. "'Substantial consummation of a reorganization plan is a momentous event, but it does not necessarily make it impossible or inequitable for an

9

appellate court to grant effective relief.'" Manges, 29 F.3d at 1042-43 (quoting Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 10 F.3d 944, 952 (2nd Cir. 1993)). Rather, we must also consider whether the remedy the ISC seek will affect the success of the plan or alter the rights of third parties that have been achieved by its substantial consummation. More specifically, we must determine whether the plan has been implemented to a point that the removal of the Cox Plaintiffs' Settlement Agreement would jeopardize the plan's success.

3. *Granting Relief Would Affect Third Parties and Plan*

Shell and U.S. Brass maintain that the Cox Plaintiffs' Settlement Agreement is an essential element of the plan, and its removal would detrimentally affect confirmation. They argue that the various settlement agreements between and among the major parties with an interest in the Chapter 11 case -- U.S. Brass, Shell, Celanese, and the Cox Plaintiffs -- were found by the bankruptcy court to be essential to the debtor's reorganization. Without the inclusion of the Cox Plaintiffs' Settlement Agreement, Shell and U.S. Brass argue that the plan would not have been confirmed.

Section 13.1 of the plan expressly provides that certain events, including the approval of the Cox Plaintiffs' Settlement Agreement, the Shell/Celanese Settlement Agreement, and the Brass Settlement Agreement, are conditions precedent to confirmation of

10

the plan. These settlements reflect the negotiations of the parties interested in the Chapter 11 case and the bargains they secured by voting in favor of the plan. Shell and U.S. Brass argue that if the 80%/20% split provided by the Cox Plaintiffs' Settlement Agreement was altered, the change would affect the interdependence of all the settlements. The plan also provides that any of the settling parties may withdraw from the plan in the event there are modifications to which the parties have not agreed. In short, U.S. Brass and Shell maintain that the Cox Plaintiffs Agreement cannot be eliminated from the plan without unraveling the entire plan. In addition, U.S. Brass and Shell oppose any modification of the plan by judicial fiat because 11 U.S.C. § 1127 provides that only the proponent of a plan or the reorganized debtor may modify a confirmed plan.

The ISC, on the other hand, contend that the plan will not unravel if the court affords them relief by modifying the 80%/20% split with the Cox Plaintiffs to a pro rata distribution. According to the ISC, the only effect of removing the Cox Plaintiffs' Settlement Agreement would be to alter the Brass Trust's distribution to holders of Class 5 claims.


III

While the ISC's proposed day surgery appears at first blush to be possible, we are persuaded it would excise parts to which other vitals of the plan are attached. To remove the Cox Plaintiffs'

11

Settlement Agreement from the plan at this point would dismantle a substantially consummated plan, requiring, for example, a restoration of the rights of the Cox Plaintiffs to pursue claims against U.S. Brass, now a reorganized entity. In addition, the releases and settlements that were negotiated among the parties would have to be undone because removal of the Cox Plaintiffs' Settlement Agreement would consequently require giving each settling party the right to withdraw from the plan. Removal of the Cox Plaintiffs' Settlement Agreement would also require that the money contributed by U.S. Brass' parent corporations to fund the plan be recovered. These circumstances persuade us that it would be inequitable for this court to consider the merits of the ISC's appeal. Accordingly, we dismiss this appeal as MOOT.

APPEAL DISMISSED.